# APPENDIX.

The following cases were accidentally omitted from the Monroe decisions.

## M. S. CARSON v. M. JOHNSON, Sheriff.

*Simulated sale.*

APPEAL from the District Court of the parish of Jackson, *Richardson*, J. *Defreese, Gray & Thompson*, for plaintiff and appellant. *Rives* and *Stubbs*, for defendant.

SPOFFORD, J. (MERRICK, C. J., dissenting.) In May, 1855, *Tennent, Denickson & Co.* had a suit pending in the District Court of Ouachita parish against *R. A. Carson*, for about $1900. *R. A. Carson* had formerly been a merchant in the town of Vernon, parish of Jackson, but had been unsuccessful, and in the month of May aforesaid was, by his own acknowledgments, insolvent. It does not appear that he had then any other visible property, except four town lots and an undivided half of about twenty-five acres of land in the parish of Jackson.

On the 11th May, 1855, about two weeks before the final judgment against him, in favor of *Tennent, Denickson & Co.*, was signed, *R. A. Carson* made a notarial conveyance of all the landed property just mentioned to the plaintiff, his brother, a young man who had but recently attained the age of majority, then living in Union parish. The conveyance professes to be a sale for the consideration of $550, " cash in hand paid," and was recorded in the Recorder's office of Jackson parish, on the 14th May, 1855.

*Tennent, Denickson & Co.* afterwards directed the Sheriff to seize the lots and land aforesaid, under their judgment against *R. A. Carson*. *M. S. Carson* sued out the present injunction against the Sheriff to restrain the sale, on the allegations that he was the true owner of the land, having bought it for $550 in cash.

*Tennent, Denickson & Co.* came in and denied the reality of the sale from their debtor *R. A. Carson* to *M. S. Carson*, averred the same to be a fraudulent simulation, and prayed for a dissolution of the injunction, with damages in their favor. After a hearing upon the merits, the District Judge dissolved the injunction with damages, and the plaintiff has appealed.

It cannot be pretended that there was any truth in the averment of the plaintiff's petition, that he bought the land in question for $550, cash in hand paid. No cash was paid. The contract sought to be proved by the plaintiff is not a sale, but a remunerative donation from his brother for services rendered him as clerk three or four years before, when he was able to pay his debts. The only proof that there was an actual debt for such services is made by a third brother, who testifies that sometime in the month of May, 1855, (the time of the pre-

tended sale,) "he heard *R. A. Carson* admit that he was indebted to plaintiff, *M. S. Carson,* in the sum of $550, for services as clerk in the town of Vernon."

Now, it is shown that all the services that were rendered dated back to the years 1850 and 1851, when the plaintiff was a lad of seventeen or eighteen years of age, inexperienced in business. Nor does it seem that the plaintiff ever claimed or his brother *R. A. Carson* ever acknowledged the existence of such a debt until the month when this conveyance was made, and it was thought necessary to fix upon a consideration for a conveyance made on the eve of insolvency. In fact, the evidence leads to the conclusion that the idea of compensation was an after-thought which never occurred to the parties till a claim for wages was prescribed, and the pretended debtor found himself in insolvent circumstances, with a large suit impending over him. One of the plaintiff's witnesses, a fellow clerk, says that *Moses Carson,* in reply to his enquiry what was he getting as clerk, said he did not know what he was getting.

One of the defendant's witnesses, a man who bought out *R. A. Carson,* in January, 1852, when the plaintiff's services terminated, testified, without objection on the part of plaintiff, that *R. A. Carson* told him he had written on to his brother to come out here, and that he was not giving him anything for clerking the first year. This was in 1850. When the witness bought out *R. A. Carson,* the latter desired him to retain his brother as clerk, and said that he had been attentive, that he had got nothing for his services, and that he would not ask much; witness retained him for three months at ten dollars a month. Does not think there was any contract between plaintiff and his brother about wages; his brother supported him. This witness further states that in the spring of 1855, he sold some horses to *R. A. Carson,* and he asked for a receipt in his wife's name, stating that he did not own any property.

The land would seem to have been worth more than the pretended price. One witness swears that *Carson's* interest in it was worth between $800 and $1000. A witness introduced by the plaintiff puts it lower, but still estimates it at $650.

It is not pretended that there was any actual possession by the plaintiff, a constructive possession by simulated notarial title is nothing. The record seems to support the views of the District Judge, who said that "the facts and circumstances of this case are irreconcilable with the reality of the transfer, while they are consistent with the hypothesis that it is a mere paper title."

It is, therefore, ordered that the judgment be affirmed, with costs

MERRICK, C. J., dissenting. I do not concur in the conclusions of the majority of the court in this case. There is no better settled rule of law than that the declarations of third parties cannot prejudice another.

The declarations of *R. A. Carson,* out of the presence of his brother, cannot prejudice the plaintiff, although in the revocatory action they may be evidence for the purpose of showing the sale was fraudulent on his part. To bind the plaintiff, his own admissions alone could be offered against him.

The testimony of *J. C. Jones,* himself also a clerk and apparently not related to the plaintiff, proves the indebtedness of *R. A. Carson* to the plaintiff. He says: That the plaintiff "was clerk for *R. A. Carson;* commenced in the fall of 1849, and continued as his clerk to January, 1852, and about that time *Carson* sold and I (*Jones*) was also one of his clerks, and left January, 1852. In 1850, my salary was $300, and in 1851, $350, and an interest in the pro-

CARSON
v.
JOHNSON.

fits of the post office. *Moses Carson's* services during the years 1850 and 1851 were worth $250 per year." It is true that the plaintiff told him he did not know how much he was to receive. But the want of a contract would not prevent the plaintiff recovering the value of his services. I know of no law which refuses to a minor his wages. Were there any reason to doubt the testimony of *James H. Carson*, the brother of the plaintiff, it is fully corroborated by the preceding testimony of *Jones*. Now, conceding that *R. M. Carson* was embarrassed, (and that would account for the delay in paying plaintiffs as well as defendants,) or even insolvent, and it does not follow that the sale made in this case was not intended as a *real sale*. If the intention of the parties was to give the plaintiff a preference over the other creditors, or to let him have the property at an inadequate price, or even if it was intended that he should hold the property for his own use, although in fraud of creditors, in all these cases, the sale is a real one, and the party attacking it is driven to his revocatory action. C. C. 1973, 1974, 1976. It is only in those cases where no title was intended to pass for the benefit of the transferee, or where it is but a mere cloak or mask, that it may be treated as a nullity, and the property seized in the first instance. 1 Ann. 299. Even in these cases the burden of proof on the injunction appears to be upon the seizing creditor to show the simulation. 10 A. R. 691.

Under our law the consideration specified in a deed is not conclusive. The cash specified in plaintiff's deed, being the precise amount of the acknowledged indebtedness of *R. A. Carson* to him, may, under the proof in the record, be considered, without violating ordinary language, as identical with such indebtedness. The law declares that the immovable was delivered to the plaintiff by the notarial act of sale. C. C. 2455. There has been no attempt to rebut this legal presumption. On the contrary, the proof shows that *R. A. Carson* resided in the parish of Ouachita, where defendant's judgment was rendered against him, whilst the plaintiff resides in the parish of Union, where the notarial act was passed, and where the land lies, the ownership of which the plaintiff claims. I think, therefore, in the absence of all proof to the contrary, that the land must be held to be in the possession of the plaintiff.

As it respects the pleadings, I think the allegation of the plaintiff, that he is the owner and that the Sheriff has illegally seized his property, is a sufficient affirmance that the plaintiff had possession under his title, which was disturbed by such seizure. Now, as the presumption of possession has not been rebutted by the defendants, the burden of proof is upon them to show that the sale was simulated, and not upon the plaintiff to show that it is *bona fide*. C. C. 1915, 2456. No principle of law is better settled than that fraud and simulation must be clearly established by proof. They are not to be presumed. I cannot see any other safe rule of proceeding, than to follow these positive requirements of the Code. They are the only sound basis upon which titles to real estate can rest with any security. If bad faith in the transfers of real estate, were to be presumed instead of good faith, few would be secure in their possessions. For there are but few who would be able to prove all the circumstances of the payments for their slaves and immovables.

I think, therefore, that the judgment of the lower court ought to be reversed, and that the seizing creditors should be left to their revocatory action.